# IN THE COURT OF APPEALS OF THE STATE OF IDAHO

## Docket No. 38445

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENTAL RIGHTS OF JOHN (2011-01) DOE AND THE ADOPTION OF JOHN DOE I, JOHN DOE II, AND JANE DOE, MINOR CHILDREN UNDER THE AGE OF EIGHTEEN. | ) ) ) ) ) ) ) | |
| JOHN (2011-01) DOE, | ) | 2011 Opinion No. 34 |
| Petitioner-Appellant, | ) ) | Filed: June 7, 2011 |
| v. | ) ) | Stephen W. Kenyon, Clerk |
| JOHN DOE III and JANE DOE II, husband and wife, | ) ) ) | |
| Respondents. | ) ) ) | |

Appeal from the Magistrate Division of the District Court of the Seventh Judicial District, State of Idaho, Bonneville County.  Hon. Colin W. Luke, Magistrate.

Order terminating parental rights, <u>affirmed</u>.

James Barrett, Bonneville County Public Defender; Scott J. Davis, Deputy Public Defender, Idaho Falls, for appellant.

Holden, Kidwell, Hahn & Crapo, P.L.L.C.; Shan B. Perry, Idaho Falls, for respondents.

---

LANSING, Judge

John Doe (hereinafter Father) appeals from the order of the magistrate court terminating his parental rights to his two sons, ages eleven and nine at the time of trial (hereinafter John Doe I and John Doe II), and his daughter, age five (Jane Doe).  We affirm.

1

# I.

# BACKGROUND

Father and Jane Doe II (hereinafter Mother) are the biological parents of John Doe I, John Doe II, and Jane Doe. The children were all born during the time Father and Mother were married. However, in 2006 Father and Mother separated and Mother filed for a divorce, which was finalized in 2008. Mother then remarried.

During the period of separation before the divorce was concluded, the children lived with Mother. Father had very little contact with them because, he later testified, he was "mentally unable" to put forth the effort as he was dealing with the divorce. The contact between Father and the children increased in early 2008 after the divorce was finalized but then tapered off around mid-July 2008. The magistrate court found that from that time until May 2010, Father had no actual contact with the children except for one telephone contact around Christmas in 2008.

In May of 2010, Mother and her spouse (hereinafter Stepfather) filed a petition for termination of Father's parental rights and to allow the adoption of children by Stepfather. After a two-day trial addressing only the termination of Father's parental rights, the magistrate court concluded that Father had unjustifiably abandoned his children and that it was in the children's best interests to terminate Father's parental rights.

Father appeals, arguing that the magistrate court erred in its determination that Father had abandoned the children, that even if he had abandoned them there was just cause, and that the magistrate erred in its determination that termination was in the best interests of the children.

# II.

# ANALYSIS

A parent's interest in maintaining a relationship with his or her child is a fundamental liberty interest, protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978); *State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007); *Doe v. State*, 137 Idaho 758, 760, 53 P.3d 341, 343 (2002). Consequently, a judicial decision to terminate a parent-child relationship must be supported by clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 768-70 (1982); *In re Doe*, 143 Idaho 343, 345, 144 P.3d 597, 599 (2006); *Doe*, 137 Idaho at 760, 53 P.3d at 343. On review, this Court will uphold the trial court's findings if they were based on substantial and

competent evidence. *Doe*, 137 Idaho at 760, 53 P.3d at 343. Substantial and competent evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion," even if the evidence is conflicting. *In re Doe*, 143 Idaho at 345-46, 144 P.3d at 599-600 (quoting *Folks v. Moscow School Dist. No. 281*, 129 Idaho 833, 836, 933 P.2d 642, 645 (1997)); *In re Doe*, 142 Idaho 594, 597, 130 P.3d 1132, 1135 (2006). The trial court is better positioned than an appellate court to observe a witness's demeanor, assess credibility, detect prejudice or motive, and make character judgments. *State, Dep't of Health & Welfare v. Doe*, 145 Idaho 662, 664, 182 P.3d 1196, 1198 (2008); *In re Aragon*, 120 Idaho 606, 608, 818 P.2d 310, 312 (1991). Therefore, the facts, and reasonable inferences to be drawn from those facts, will be viewed in the light most favorable to the trial court's decision. *Doe v. Doe*, 148 Idaho 243, 245-46, 220 P.3d 1062, 1064-65 (2009); *In re Doe*, 142 Idaho at 597, 130 P.3d at 1135.

A court may terminate a person's parental rights if it finds both that one of the statutory grounds for termination is present and that termination is in the best interests of the child. Idaho Code § 16-2005(1). Abandonment is one of those statutory grounds. I.C. § 16-2005(1)(a). Abandonment means:

> the parent has willfully failed to maintain a normal parental relationship including, but not limited to, reasonable support or regular personal contact. Failure of the parent to maintain this relationship without just cause for a period of one (1) year shall constitute prima facie evidence of abandonment under this section . . . .

I.C. § 16-2002(5).

In order to "willfully" fail to maintain a normal parental relationship, the parent must have the ability to maintain it and choose not do so. *Doe I v. Doe II*, 148 Idaho 713, 716, 228 P.3d 980, 983 (2010). There is no universal standard for defining a "normal parental relationship"; whether such a relationship exists depends on the circumstances of each case. *Doe I*, 148 Idaho at 715, 228 P.3d at 982; *In re Adoption of Doe*, 143 Idaho 188, 191, 141 P.3d 1057, 1060 (2006).

Father asks us to hold that the magistrate court erred in its determination that he willfully failed to maintain a normal parental relationship with the children or, in the alternative, that even if he has so failed, the court erred in not finding just cause. Father further asks us to hold that the magistrate erred in finding that termination is in the best interests of the children.

3

A. **Regular Personal Contact**

Father argues that Mother did not present clear and convincing evidence of a lack of regular personal contact that would support a finding that he failed to maintain a normal parental relationship with his children. Father contends that his contact with his children in early 2008, an actual visit with the oldest child in the summer of 2009, and his unsuccessful attempts to contact his children in 2010 show effort to communicate and maintain a relationship with the children that precludes a finding of abandonment.

Contrary to Father's assertions, there is substantial and competent evidence supporting the magistrate court's finding that Father did not have regular personal contact with his children from mid-July 2008 to May 2010, a period which exceeds that necessary for a prima facie showing of abandonment under Section 16-2002(5). Although Father testified that he could remember five specific instances of "attempted" contact with his children in this twenty-two-month period, he testified to only one instance of *actual* contact with all three children, a telephone call in December of 2008. Father also testified to an in-person contact with his daughter in November of 2009. Mother testified to only one instance of actual contact between Father and the children, the December 2008 telephone call, and testified that Father made no other attempts to contact the children. Mother's testimony was corroborated by telephone records that showed no calls from Father's telephone to Mother's telephone from January of 2009 until May of 2010. This evidence is sufficient to support the trial court's findings.

There was some evidence, in addition to Father's testimony, that conflicted with Mother's testimony. John Doe I testified that he had an in-person meeting with his Father in 2009 while John Doe I was visiting a paternal cousin, but Father did not testify to any such contact with his son. Although one of Father's witnesses testified that Father had numerous actual contacts with the children, the trial court justifiably found her testimony untrustworthy as it contradicted even Father's own account of actual contact. As stated above, witness credibility is within the province of the trial court.

Even Father's own testimony, which claimed slightly more contact with his children than Mother described, did not demonstrate any level of visits or telephone calls that would approach "a normal parental relationship." He testified that he had one telephone contact with each of the children, and possibly one additional visit with his daughter, within the twenty-two-month period. As to John Doe II, Father acknowledged he had no contact other than the December

4

2008 telephone conversation. Even assuming the summer 2009 contact with John Doe I and the November 2009 contact with Jane Doe occurred, having contact with a child twice in almost two years is not regular personal contact nor a normal parental relationship, and the magistrate court did not err in so holding.

**B.      Just Cause**

Father also asserts that he showed "good cause" or "excusable neglect" for failing to maintain regular contact with his children, and therefore a finding of abandonment as defined in I.C. § 16-2002(5) was not justified. Father contends that he attempted to engage in regular contact but Mother's interference made these attempts unsuccessful, that his indigent circumstances prevented him from taking the children on several occasions, that he lived at a distance from the children which made it difficult for him to visit them, that he was under criminal probation during a portion of the relevant timeframe that restricted him from leaving his county of residence, and that he did not have a driver's license.

We conclude, however, that the trial evidence supports the magistrate court's finding that Father did not have just cause for his sparse contact with his children and did not maintain a normal parental relationship with them, even taking into account the circumstances described by Father. Mother testified that the only instances in which she actually prevented Father from visiting the children occurred before and after the relevant twenty-two-month period. She said that before mid-July 2008, she once refused to allow Father to take Jane Doe for a visit, but ultimately Father was able to see the child on that occasion. Mother admitted that after she filed the petition to terminate Father's parental rights in May 2010, she refused to allow him to visit or speak with the children. However, for a period of almost two years between these instances, Father had, at most, two contacts with his children, and by Mother's testimony this infrequency was not due to her interference but to the absence of any communication from Father. According to Mother's testimony, although she wanted to have advance notice of contact between Father and the children so that she could supervise, she did not actively stop any such visitation or telephone contact during this period. Because witness credibility is an issue for the trial court, Father has not shown error in the trial court's finding that Mother's testimony on the

5

issue of interference was more credible than Father's, especially considering the telephone records that corroborated Mother's testimony and contradicted Father's contentions.[1]

Father also asserts that limitations on his ability to travel were a just cause for his failure to visit his children. However, Father did not live a prohibitive distance away; he resided just a thirty-minute drive from his children's home. Father's probation that prohibited travel out of his county did not make personal visitation impossible, for Father testified that he could leave the county with permission for a "really good reason." Father did not testify that he ever sought permission from his probation officer for brief trips out of the county to facilitate visitation with his sons and daughter. Moreover, this probation was in effect for only six months out of the almost two-year relevant period. Even if this restriction made personal visitation impossible for half a year, it does not explain the lack of contact for the balance of the relevant timeframe, nor does it justify a lack of telephone calls or letters.

Father was without a driver's license, but only for a period of six months, which again does not justify the lack of visits for the remainder of the twenty-two-month timeframe or the lack of telephone calls or letters to the children. Father also presented no explanation as to why he could not have used alternative means to visit with his children, such as asking others to bring the children to him or asking for rides to his children's residence only thirty minutes away. In short, the magistrate court could properly view as disingenuous Father's attempts to characterize his travel restrictions as prohibitive, and they do not legitimize his near-total failure to visit or communicate with his children for twenty-two months.

Finally, Father testified at trial that at times he was not financially able to take the children because he could not feed them. This assertion, however, is not only insufficient to explain lack of even telephone contact, it is inconsistent with Father's testimony about his current financial ability to exercise visitation. Father testified that, at the time of trial, he was financially able to accept visits with his children even though he was then unemployed. He had been employed until September of 2009, through a significant portion of the relevant timeframe. Father offered no explanation as to why he was unable to receive his children for visits due to economic circumstances while he was employed, but somehow was at the time of trial in a better position to take them while he was unemployed with no income. In any event, Father could have

---

[1] Father himself claimed only five specific attempts to contact his children that were allegedly thwarted by Mother in a twenty-two-month period.

exercised visitation without overnight visits or visits that included mealtimes. Father could have taken the children for short periods during the day or at least had more frequent telephone contact. The magistrate was justified in finding that Father's attempt to blame his economic situation for his lack of communication with the children was unpersuasive. The trial evidence amply supports the magistrate court's determination that Father did not show just cause for his failure to maintain a normal parental relationship.

## C. Best Interests

Father also challenges the magistrate's determination that termination of his parental rights is in the children's best interests. He asserts that because the court did not find that there was abuse, a detrimental effect on the children's health, emotions, or school work, or an economic situation that would improve with the termination of Father's parental rights, there was insufficient basis for a conclusion that it was in the best interests of the children to terminate his parental rights.

We conclude, however, that substantial evidence indicated that termination is in the children's best interests. As the magistrate court noted, the children had created a father-child bond with Stepfather. In fact, the youngest child, Jane Doe, does not even know Father due to his lack of contact with her. Although the oldest son testified that he would like to have visitation with Father, he also stated that he wished to be adopted by Stepfather. There was testimony that Father's sporadic visits before the twenty-two-month period were themselves detrimental to the children's emotions and school work. Stepfather testified that the children's performance academically and in sports improved dramatically during Father's prolonged absence and that when Father had sporadic visits in early 2008, the children exhibited bad behavior and attitudes for a significant period afterward. Mother and Stepfather testified that prior to mid-July 2008, Father would schedule visits and then not appear, leaving the children waiting for hours until they were in tears. Additionally, after Mother filed this action for termination in May of 2010, Father contacted John Doe I without Mother's knowledge and made representations to the boy that caused him confusion and turmoil. At trial, Stepfather stated:

> [Father] is what I would call a Disneyland dad. I'm going to buy you a phone. I'm going to do this; I'm going to do this; I'm going to do this. And none of these things materialize ever. I'm telling you, you know, I've never been in trouble; I've never done this; I'm always calling you, to the point we had to sit down finally and talk to [John Doe I] and say we're trying to shelter you from a few things, but let me just show you. Showed him the repository, you know, yes.

7

Was [Father] in trouble? Yes, it had been just days ago. He has all these DUIs. [John Doe I] is in tears.

I mean, the kid is literally stuck in the middle of a whirlwind, and to continue letting a whirlwind take control of these young children just is not fair to them.

It was shown at trial that Father's presence in the children's lives is detrimental due to its irregular, unpredictable, and unstable nature and due to the things that Father says to them. In contrast, Mother and Stepfather have provided emotional and financial support and stability for many years, and Stepfather has been the children's father figure since 2006. Contrary to Father's assertion, it is not necessary that there be evidence of abuse or greater detriment to the children's well-being in order to justify a finding that termination is in the children's best interests. The magistrate court's holding that the termination of Father's parental rights was in the children's best interests is sufficiently supported by trial evidence.

## III.

## CONCLUSION

The order terminating Father's parental rights on the ground that he had abandoned his children and that termination is in the children's best interests is affirmed. Costs on appeal to respondents.

Chief Judge GRATTON and Judge GUTIERREZ **CONCUR.**